SIMMS v. STANTON et al. (two cases).

(Circuit Court, N. D. California. June 25, 1896.)

COPYRIGHT—INFRINGEMENT—FAIR USE.

　　A later writer on an art or science, like physiognomy, though consulting and using the works of an earlier writer on the subject, will be *held* not to have pirated, but to have made a fair use of, them; it not appearing that they have been drawn from to a substantial degree, notwithstanding there are some errors common to both, and they have a similar division of systems as a basis, such division being only a somewhat altered form of a division in a work of a previous writer, from which they both had a right to draw material.

In Equity.

Two suits in equity for alleged infringement of certain copyrights obtained by complainant upon several books written and published by him on the subject of Physiognomy. Injunction against further infringement and damages for past infringment were asked for. Upon hearing on the merits both bills were dismissed.

Joseph D. Redding (J. E. Runcie and A. N. Hayes, on the argument, and Clara Foltz, of counsel), for complainant.

Fisher Ames (Wheaton, Kalloch & Kierce, of counsel), for respondents Mary O. Stanton and the San Francisco News Company.

Robert Harrison, for respondents Argonaut Pub. Co. and F. M. Pixley.

MORROW, District Judge. These are two suits in equity, instituted by Joseph Simms. The first is brought against Mary O.

Stanton, San Francisco News Company, Argonaut Publishing Company, and Frank M. Pixley, and the second against Mary O. Stanton alone. Both cases were, by consent, heard together, and, in the view I take, a decision in one will cover the other. During the argument a dismissal was filed by complainant as to the Argonaut Publishing Company and Frank M. Pixley. The ch· ·ges in both bills are substantially the same. The complainant ..lleges an infringement of certain copyrights obtained by him on several books written and published by him upon the subject of Physiognomy, and asks for an injunction and damages. The only difference between the two bills is that in the first bill the respondent Mary O. Stanton, in writing a work on Physiognomy, consisting of one volume, entitled "Scientific Physiognomy—How to Read Faces," and the other respondent, the San Francisco News Company, in publishing said work, are charged with having infringed three of complainant's works; in the second bill, which is brought only against Mary O. Stanton, she is charged with having infringed upon five of complainant's works (including the three referred to in the first bill), in writing and publishing another and a later work, entitled "A System of Practical and Scientific Physiognomy," consisting of two volumes. It therefore appears that two separate works of respondent Stanton are the basis of these two different suits. The first work of hers, claimed to constitute an infringement, consists of a small book numbering 351 pages, entitled, as stated, "Scientific Physiognomy—How to Read Faces." It was copyrighted in 1879, and the second edition was published in 1881, in San Francisco, by the San Francisco News Company. The second work consists of two volumes, containing 1,222 pages. It is, in many respects, a fresh edition of the first book, but it deals with the subject much more elaborately, contains a great deal of new matter, and many quotations and illustrations not found in the first work. It, however, bears a different title from the first production, being called "A System of Practical and Scientific Physiognomy." It was copyrighted in 1889, and published in 1890 in Philadelphia and London.

The works of complainant alleged in his first suit to have been infringed upon by respondent's earlier work entitled "Scientific Physiognomy—How to Read Faces," are as follows: (1) "Nature's Revelations of Character, or the Mental, Moral, and Volitive Dispositions of Mankind as Manifested in the Human Form and Countenance." consisting of one volume of 600 pages, copyrighted in 1872, and published in 1873. (2) "Nature's Revelations of Character of Physiognomy Illustrated," consisting of one volume of 600 pages. This book is a reprint, with but slight changes, of the previous work, and was published in 1879. (3) "Health and Character, with Directions for Their Improvement," as revised and reprinted in 1879, consists of a small pamphlet, containing 80 pages of closely-written matter. As the second of these works is substantially a reprint of the first, the allegation that the respondent pirated from these first two books amounts simply to the charge that she has taken matter common to both editions.

In the second suit the works of complainant alleged to have been pirated and infringed upon include the three comprehended in the first suit as above set out, and also two additional ones, as follows: (4) "Physiognomy Illustrated, or Nature's Revelations of Character," consisting of one volume of 600 pages, published in 1891 as the tenth edition. This work also is a reprint, with but slight and unimportant changes, of the first two books mentioned above. When, therefore, it is alleged that respondent pirated from these three books, the charge, in plain terms, is that she infringed upon all three editions, inasmuch as the identical matter claimed to have been pirated appears in all three. The fifth and last book of complainant which, it is claimed, respondent infringed in writing and publishing her last or two-volume work is a pamphlet, copyrighted in 1884, and entitled "Practical and Scientific Physiognomy, or Character and its Expression in Figure, Feature, and Action." It is very brief, containing but 28 pages, and much the same matter may be found in the other works referred to. These works, both complainant's and respondent's, all treat on the common subject of physiognomy, with perhaps the exception of complainant's pamphlet entitled "Health and Character, with Directions for Their Improvement," which, as the title indicates, involves a different subject, but based upon supposed principles of physiognomy. In addition to these books, from a reading and comparison of which the court must determine whether or not the respondent has committed a substantial infringement of complainant's works, the complainant has submitted and introduced a number of exhibits, containing excerpts, or so-called "parallelisms," in which he undertakes to compare extracts from his own and respondent's books, and which he claims tends to show that respondent pirated from his works in writing hers. He has also submitted several drafts, in which he has collated errors, inaccuracies, repetitions, all of which, he contends, show that the respondent has servilely copied or imitated his own productions, both in ideas and in composition. In addition to these many exhibits, is the testimony of the complainant and respondent, taken before the master in chancery. In his testimony the complainant reiterates his charges of wholesale piracy, and indicates where, and in what respects, in his opinion, the respondent has pirated. The respondent, on the other hand, both in her answer and as a witness on the stand, denies absolutely and unequivocally that she servilely copied from or imitated any of complainant's works in writing her two works on physiognomy. She admits that she consulted complainant's books, or some of them, as she did those of other authors on that and kindred subjects, and, in fact, in her first work, published in 1879, she gives the complainant due credit as being an able and well-known physiognomist. She claims that such use as she did make of complainant's works was justified and permissible as a "fair use," and that her books are the result of her own independent study, research, and labor. As the testimony of the parties is irreconcilably conflicting, we must look for the ultimate solution of the question of piracy to the rival works, and

from a comparison of them determine to what extent, if at all, respondent has illegally copied complainant's books. But first let us inquire what use of another's work amounts to a piracy.

Probably the most accurate, and at the same time concise, statement of the test of piracy is that laid down by Mr. Circuit Justice Story in Emerson v. Davies, 3 Story, 768, Fed. Cas. No. 4,436, a leading case in this country on the law of copyright. He says:

"It may be laid down as the clear result of the authorities in cases of this nature that the true test of piracy or not is to ascertain whether the defendant has, in fact, used the plan, arrangements, and illustrations of the plaintiff, as the model of his own book, with colorable alterations and variations, only to disguise the use thereof; or whether his work is the result of his own labor, skill, and use of common materials and common sources of knowledge, open to all men, and the resemblances are either accidental or arising from the nature of the subject. In other words, whether the defendant's book is, quoad hoc, a servile or evasive imitation of the plaintiff's work, or a bona fide original compilation from other common or independent sources."

In the case of Sayre v. Moore, 1 East, 361, cited in a note to Cary v. Longman, Id. 358, 362, Lord Mansfield used the following language:

"The rule of decision in this case is a matter of great consequence to the country. In deciding it we must take care to guard against two extremes equally prejudicial,—the one, that men of ability, who have employed their time for the service of the community, may not be deprived of their just merits, and the reward of their ingenuity and labor; the other, that the world may not be deprived of improvements, nor the progress of the arts be retarded. The act that secures copyright to authors guards against the piracy of the words and sentiments, but it does not prohibit writing on the same subject. As in the case of histories and dictionaries: In the first, a man may give a relation of the same facts, and in the same order of time; in the latter an interpretation is given of the identical same words. In all these cases the question of fact to come before the jury is whether the alteration be colorable or not. There must be such a similitude as to make it probable and reasonable to suppose that one is a transcript of the other, and nothing more than a transcript. So, in the case of prints, no doubt different men may take engravings from the same picture. The same principle holds with regard to charts. Whoever has it in his intention to publish a chart may take advantage of all prior publications. There is no monopoly of the subject here, any more than in the other instances; but upon any question of this nature the jury will decide whether it be a servile imitation or not. If an erroneous chart be made, God forbid it should not be corrected, even in a small degree, if it thereby become more serviceable and useful for the purposes to which it is applied."

Drone, in his work on Copyright (page 385), says:

"The true test of piracy, then, is not whether a composition is copied in the same language or the exact words of the original, but whether, in substance, it is reproduced; not whether the whole, but whether a material part, is taken. In his view of the subject, it is no defense of piracy that the work entitled to protection has not been copied literally; that it has been translated into another language; that it has been dramatized; that the whole has not been taken; that it has been abridged; that it is reproduced in a new and more useful form. The controlling question always is, whether the substance of the work is taken without authority."

Copying is not confined to literal repetition, but it includes also the various modes in which the matter of any publication may be adopted, imitated, or transferred, with more or less colorable alterations, to disguise the piracy. In other words, if such use is made of a previous work as to substantially diminish its value, or the

labors of the original author are, to a material degree, appropriated by another, such use or appropriation is then deemed sufficient in point of law to support a suit for infringement of copyright. See 4 Am. & Eng. Enc. Law, pp. 163, 164; Greene v. Bishop, 1 Cliff. 186, Fed. Cas. No. 5,763; Lawrence v. Dana, 4 Cliff. 1, Fed. Cas. No. 8,136; Emerson v. Davies, supra; Gray v. Russell, 1 Story, 11, Fed. Cas. No. 5,728. Another familiar doctrine of the law of copyright is that an author may resort with full liberty to the common sources of information, and make use of the common materials open to all. But his work must be the result of his own independent labor. Drone, Copyr. pp. 416, 417, and cases there cited. A copyright gives no exclusive property in the ideas of an author. These are public property, and any one may use them as such. Perris v. Hexamer, 99 U. S. 674; Baker v. Selden, 101 U. S. 99. In the last case the court say:

"Where the truths of a science or the methods of an art are the common property of the whole world, any author has the right to express the one, or explain and use the other, in his own way."

What the law seeks to prohibit and to punish is the use of any part of a previous book, animo furandi, with an intent to take for the purpose of saving oneself labor. Banks v. McDivitt, 13 Blatchf. 163, Fed. Cas. No. 961. That physiognomy is an art, or approximates to a science, is, I think, not open to serious dispute. According to Webster, physiognomy is:

"(1) The art or science of discerning the character of the mind from the features of the face; or the art of discovering the predominant temper, or other characteristic qualities of the mind, by the form of the body, but especially by the external signs of the countenance, or the combination of the features. Bacon. Lavater. * * * (3) The art of foretelling the future fortunes of persons by indications of the countenance."

The respondent admits that in writing her two works on physiognomy she made use of and referred to the complainant's works. But this she was at liberty to do, within certain limitations. Gilmore v. Anderson, 38 Fed. 846. In Banks v. McDivitt, at page 166, 13 Blatchf., Fed. Cas. No. 961, Judge Shipman says:

"I do not understand that the rule prohibits an examination of previous works by the compiler before he has finished his own book, or the mere obtaining of ideas from such previous works; but it does prohibit a use of any part of the previous book animo furandi, 'with an intention to take for the purpose of saving himself labor.'"

She was, therefore, privileged to make a "fair use" of complainant's books. What constitutes a "fair use" is often a very difficult question to answer. What would be a "fair use" in one case might not be in another. In determining this question, courts often look more to the value of the matter pirated than to the quantity. Farmer v. Publishing Co., 1 Flip. 228, Fed. Cas. No. 4,651; Gray v. Russell, 1 Story, 11, Fed. Cas. No. 5,728. Drone gives the following statement of what constitutes a "fair use." He says (page 394):

"The fair uses, other than those of legitimate quotation, which an author is privileged to make of a copyrighted work in the preparation of a rival or other publication, are restricted by recent English decisions to very narrow limits. The later compiler of a rival publication may learn from a copyrighted

work where to find and how to use materials of which he might otherwise be ignorant. He may derive from it information, hints, suggestions, etc., which otherwise would have escaped his notice. He may use it as a guide in the preparation of his own work, to verify the accuracy and completeness of his own, or to detect errors, omissions, and other faults in his own. But, while he may thus use the copyrighted work as a guide or instructor, he must go to the common sources for materials, and his composition must be the product of his own labor. If, to a material extent, he copies from the protected work, or appropriates the results there found, it is piracy."

In a note on the following page (395) the learned author cites the case of Jarrold v. Houlston, 3 Kay & J. 708, and gives the following quotation from the opinion of Vice Chancellor Wood, delivered in that case:

"I take the illegitimate use, as opposed to the legitimate use, of another man's work on subject-matters of this description to be this: If, knowing that a person whose work is protected by copyright has, with considerable labor, compiled from various sources a work of itself not original, but which he had digested and arranged, you, being minded to compile a work of a like description, instead of taking the pains of searching into all the common sources, and obtaining your subject-matter from them, avail yourself of the labor of your predecessor; adopt his arrangements; adopt, moreover, the very questions he has asked, or adopt them with but a slight degree of colorable variation, and thus save yourself pains and labor by availing yourself of the pains and labor which he has employed, that I take to be an illegitimate use."

See, further, on this subject, Pike v. Nicholas, 5 Ch. App. 251; Morris v. Wright, Id. 279; Nichols v. Loder, 2 Coopt. Cott. 217; Cary v. Kearsley, 4 Esp. 170. Manifestly, the complainant has no monopoly in the subject of physiognomy. His copyrights did not protect the ideas or truths, if they may be termed such, peculiar to this art or science. These were public property. In his testimony complainant says:

"In the first place, she has followed the forms that I have,—five of them,—in the regular order which I have them, changing the first name, and calling it 'Vegetative.' She calls them 'systems.' She changed the name from 'Abdominal Form' to 'Vegetative System.' Her systems are precisely the same, including the same ground that mine do, in every particular, except that she puts the liver in the thoracic division, which I never heard of. I never heard of the liver being up in that part before. But the systems and description of those are mine. That is wherein I hold the copyright. I hold the copyright on those. As far as the systems are concerned, she has as good a right to those as I have. But when the descriptions are examined, that is where the physiognomy comes in. That belongs to me particularly, because I wrote that out myself. Whether it is right or not, is not for me to say now, but it was written out and adopted—the descriptions of those forms."

Speaking of the "muscular form," which complainant claims as part of his copyright, he testifies that:

"No author, previous to myself, has ever classified the faculties under these forms, that I am aware of or know anything of. And especially no one has held that there was such a thing as a muscular form until I printed it in my book. No person ever printed such a thing as a muscular form or a muscular temperament, that I am aware of."

In the beginning of his works on Physiognomy, the complainant, after criticising as "false" certain ancient systems of physiognomy, says:

"I prefer, in the consideration of this subject, to discard the word 'temperament' altogether, as liable to grave misunderstanding, and to designate the

different classes of men by their different physical forms. These forms, which are five in number, I shall consider in the following order: The abdominal form; the thoracic form; the muscular and fibrous form; the osseous, or bony, form, and the brain and nerve form. In this order I follow nature in the manner in which she unfolds the respective powers of mankind. I ascend from that which develops first to that which is latest in maturing, from the lower part of the face and physique to the superior portions; and the same order is maintained throughout the entire classification of this book. The number of the classes of the signs of the faculties correspond with the number of forms which the signs and their even combinations represent. Every person, of course, possesses all of these forms, but in the vast majority of instances they are unequally developed, in which case the predominating form or forms, by marking the leading characteristic, indicates the class to which the subject belongs."

Then follows a description of each of these "forms," so called, and their function or place in the art or science of physiognomy, as viewed by complainant. The respondent, in her two works, substantially adopts and follows this same division, calling them "systems." She, however, first makes three divisions of the face, which she terms, respectively, (1) the chemical, (2) the architectural, and (3) the mathematical. She then includes in 'these three divisions the five different forms or systems alluded to in the following language:

"We now commence with the general proposition that 'all form indicates character.' Within the three grand divisions of the face we find the facial indications of five different systems of functions which go to create the different forms of man, and which are always found in combination, but in different degrees of development in different persons. These are named the vegetative, the thoracic, the muscular, the osseous, and the brain and nerve systems."

It is apparent that the respondent's division of the five different "systems," as she styles them, are the same as the complainant's, with the exception that she uses the word "vegetative" instead of the word "abdominal," employed by complainant. This term, she says, she derived from a work entitled "Evolution of Man," by Haeckal (volume 1, p. 196), published in 1879, and introduced in evidence. The other designations, and, in fact, the whole idea of these five different "forms" or "systems" being indicative of character, she testifies positively that she acquired from Grimes' Compend of the Phreno-Philosophy of Human Nature, page 62, published in 1850. This work was introduced in evidence, and it was found that he makes practically the same division under the title of "Temperaments," a name which complainant discards as "liable to grave misunderstanding." Grimes divides the "Organs or Systems" into six classes: (1) The osseous system; (2) the muscular system; (3) the phreno-brain and nervous system; (4) the digestive system, styled by complainant the "abdominal form," and by the respondent the "vegetative system;" (5) the arterial system; and (6) the venous or bilious system. This division of temperaments indicates that the division of organs to represent character was not entirely original with the complainant. It is true that he did elaborate upon this division, but the idea itself seems to have been original with Grimes, or at least was known to him. The respondent, in writing her works, had the right to refer to previous writers on the subject, and in taking

Grimes' prior division, as she testified she did, though in a somewhat altered form, she cannot be said to have infringed upon complainant's works simply because he makes a similar division. As stated by Drone, in his work on Copyright (page 417), an author "is entitled to use any information or materials which may be obtained from common sources, either published or unpublished." On page 424, he says:

"There is no recognized principle which will prevent a subsequent compiler from copying common materials from an existing compilation, and arranging and combining them in a new form, or using them for a different purpose. It is true that in this case he avails himself to some extent of the labor and research of his predecessor, instead of obtaining the material from the original sources. But the first compiler has no exclusive property in that of which he is not the author, and which may be used by any one. His copyright protects only his own arrangement of the materials which he has selected."

And on page 427 he says further:

"But there is nothing in the law of copyright to prevent any person who has obtained common materials from the original sources from using them in substantially the same manner, and for the same purpose, as they have been previously used, provided the arrangement is his own, and is not servilely copied from the work of another. Two authors, writing on the same subject, citing the same authorities, and taking the same illustrations and quotations from common sources, will naturally use such common materials for like purposes and in a similar manner. As far as citations of authorities, quotations, etc., are concerned, there may be a striking resemblance, amounting in some instances to substantial identity. This, however, does not amount to piracy, unless it appears that there has been servile copying from the preceding work."

The copyright obtained by complainant for his works did not protect him in the use of material which had originated or had been utilized by some previous writer on the same subject. The complainant admits as much in his testimony when he states:

"But the systems and the description of those are mine. That is wherein I hold the copyright. I hold the copyright on those. As far as the systems are concerned, she has as good a right to those as I have."

Having the right to use the systems, it is apparent that their description would necessarily be somewhat similar. But I am not prepared to say that they are so strikingly similar as to indicate substantial piracy. Had the complainant first used these systems as a basis of physiognomy, he undoubtedly would be justified in claiming that the respondent had committed piracy, but he cannot, manifestly, use substantially the ideas, though in a more elaborate form, of a previous writer, and, when a later writer also resorts to the same material for her own purposes, claim that she has committed a piracy upon his works. While the respondent candidly admits that she consulted complainant's works in preparing and writing her own, and while the excerpts or parallelisms tend to show that she borrowed from complainant's books, and in several instances certainly approached very closely to the line that marks the boundary between a fair and an illegitimate use, still I think, upon the whole of the case, that the complainant, on whom the burden of proof lies, has failed to show such substantial piracy on the part of respondent as would entitle him to relief in a court of equity. A controlling factor,

which, among others, has influenced me in determining this case is that both authors were writing on the same subject. They were both students in the art or science of physiognomy, and had been so employed for a number of years. They had been on friendly terms with each other. It is but natural, therefore, that many expressions and definitions peculiar to the art or science of physiognomy were used by both, nor is it very surprising that there should be such striking similarity in some parts of these rival works. Indeed, it is difficult to conceive how writers on the same art or science can very well avoid resorting to the same common sources of information and using the same common materials, and also in employing similar expressions and terms peculiar to the subject they are treating of. Especially is this true of a subject like physiognomy, where certain peculiarities of the face are generally accepted by physiognomists as indicative of certain qualities of character. In explaining indicia of character which it is claimed may be found depicted on the forehead, the nose, the eye, the mouth, the chin, the ear, etc., statements of different writers, unless they have some new ideas to advance, must be more or less similar in thought, expression, and meaning. I recognize, of course, that there must be a careful limitation to this similarity, otherwise an opportunity is afforded for unscrupulous writers to servilely imitate or copy from previous works, and to make detection of piracy extremely difficult. But, nevertheless, the court must be satisfied that the person accused of plagiarism has in fact copied or imitated another's works, and that he or she has done so in some substantial degree. The English case of Pike v. Nicholas, 5 Ch. App. 251, is the authority most closely analogous to the one at bar. There both writers wrote on the subject of ethnology. The salient facts as they appear in the statement of the case are as follows: The plaintiff published a book, and the defendant afterwards published a book on the same subject, in which he mentioned the plaintiff's book as one of the authorities consulted by him. Previous thereto both parties had engaged in a contest for a prize offered by a society in England for the best essay in English, Welsh, French, or German on "The Origin of the English Nation, with Reference to the Question How Far That Nation is Descended from the Ancient Britons." The plaintiff, who was a barrister, and had devoted himself to literary and scientific pursuits, and especially to the study of anthropology, sent in to the society an essay, as did the defendant. No prize was awarded by the arbitrators, but two of them expressed the hope that the essay sent in by plaintiff would be published, and thereafter the plaintiff published his essay in a revised form under the title, "The English and Their Origin; A Prologue to Authentic English History." The same prize was offered the following year. The plaintiff did not compete on this occasion, but the defendant did, and sent in an essay. No prize was, however, awarded. The defendant determined to publish his essay, which he did under the title, "The Pedigree of the English People." The plaintiff filed a bill to restrain the defendant from printing, publishing, etc., his book,

on the ground that the defendant had copied and pirated from his work. In proof of the charge the plaintiff showed, among other things, that the defendant had referred to a large number of authorities which plaintiff had previously cited. The defendant stated that he had taken the references from a previous writer that plaintiff had also cited from, and he further showed that he had referred to two authorities not mentioned by plaintiff; but as to two of the authorities cited by plaintiff, and also by defendant, the latter was unable to state where he had found them. The vice chancellor was of the opinion that the plaintiff had made out his case, but it was held by the court of appeal in chancery that, under all the circumstances of the case, although the defendant had borrowed some from plaintiff's work, still he had not made such use of plaintiff's book as to entitle the latter to an injunction; that an author who has been led by a former author to refer to older writers may, without committing piracy, use the same passages in the older writers which were used by the former author; and that an author has no monopoly in any theory propounded by him. Lord Hatherley, L. C., said, among other things:

"A case of alleged piracy, like this, was obviously very difficult to determine when the authors took a common subject, and depended upon authors open to both of them, and when portions of the one work which were said to resemble portions of the other work might be taken from those common authors, to which each was at liberty to resort. First. There was a common subject, which it was very important to bear throughout in mind in the consideration of this case. The subject was probably suggested to the minds of both these gentlemen by the prize which was offered by the committee of the National Eisteddfod for the best essay on 'The Origin of the English Nation, with Reference to the Question How Far That Nation is Descended from the Ancient Britons.' This question admitted of only two opinions,—the one being that we were in a scanty degree descended from the ancient Britons; the other, that we were chiefly descended from them. And perhaps it was not taking too great a liberty with either of these two gentlemen to say, not that their minds would be biased by the question being propounded to them by a Welsh society, but that, if they had not been of that opinion which it was most likely a Welsh society would entertain, they probably would not have been competitors for the prize. Accordingly, as was to be expected, the writers of both these treatises took exactly the same view in this respect, namely, that the ancient Britons largely preponderated as an element of the English nation. That being so, each of them would naturally begin to look about for the authors bearing on this question. Supposing them bona fide about to produce an original work, they would naturally look out for all the older authorities who had written upon the subject. There were a variety of authors on the subject, especially Dr. Pritchard, to whom, in the first instance, both of them would have recourse. They referred to those authors who discussed the evidence of the origin of the present races, namely, existing histories which had come down to us of the adventures of these races; the existing evidence of language, which had been traced with so much skill by a variety of authors, both here and on the continent; the existing physical characteristics, and the existing customs and habits of life. Those four characteristics would be found in Pritchard, and in almost any author who had taken upon himself to write on national origin, as traceable in the existing inhabitants of the country. Therefore, before approaching the question whether or not one author had taken from the other, it must be borne in mind that a great deal of similarity would naturally be found in the works of authors writing on such subjects as these. Then, secondly, as to the common sources. When once it was established that there were common sources, it would be naturally expected that there would be great similarity in the state-

ments of the facts which were narrated from those common sources. Accordingly there might be traced throughout the work of the defendant a great similarity to the outline and plan of that of plaintiff. With regard to that part of the case his lordship thought that the vice chancellor had laid a great deal too much stress upon the fact of the divisions of the subject in the defendant's work being similar to the divisions of the subject in the plaintiff's work. In the MSS. of the original treatise, marked 'A' and 'B,' so far as it was called original by the defendant, these very divisions were set out, and very naturally, regard being paid to all that had been written by authors on this subject; and it must be taken that the defendant, in his first treatise, which he sent in for competition in 1865, before he possibly could have seen the plaintiff's treatise, had originated a division which was proper and peculiar to a subject of this character."

After a considerable discussion of some of the evidence, his lordship continues:

"Then the question was, what use had he made of it [plaintiff's book]? He did not say that he had made any use of the plaintiff's book at all. The worst part of the defendant's case was that he did not make the frank admission—which he was bound to make—that he made use of the plaintiff's book; but he said that he went to the common sources, such as the Monumenta Historica, and that was all that he did. No doubt he did go to the common source, but the plaintiff said, 'I do not doubt that you examined the Monumenta Historica, but you have made a great deal more use of my book than you ought to have made."

Sir G. M. Giffard, L. J., said:

"First, with regard to the general nature of the two books. The plaintiff undertook a more formidable task than was ever undertaken before in any copyright case, for there was the fact that the two parties started with exactly the same theme to treat of. That was beyond all question. These books were written with reference to a prize that was proposed to be given by a society in Wales. They started with a desire to arrive at, as nearly as possible, the same conclusion, and with a desire, no doubt, to glorify the ancient Britons as much as could well be done. Moreover, what may be termed the 'platform divisions,' by means of which they worked out their books, were very nearly the same, and were for the most part taken from Dr. Pritchard's book, and thus they were at once found starting entirely in the same groove. Besides, their books consisted mainly of results gathered from other authorities, and could not, in the true sense of the word, be treated as original, except to a very slight extent. As to this, the vice chancellor laid down most accurately in his judgment 'that there is no monopoly in the main theory of the plaintiff, or in the theories and speculations by which he has supported it, nor even in the use of the published results of his own observations.' It would, therefore, at once appear that the task undertaken by the plaintiff was an almost impossible one, unless he could show that there were substantial passages either actually copied, or copied with mere colorable alterations. It would not do to show merely one or two passages, but some material part of the book must be shown to have been taken."

Applying this view of the law to the case at bar, the material elements of piracy appear to be wanting. The errors which complainant claims have crept into respondent's works, tending to show that she must have copied from his works, are not important enough, in my opinion, to establish the fact of servile copying or piracy. As to the repetitions, all that can be said is that repetitions in a work such as that on the subject of physiognomy must necessarily occur; and, while the works of respondent are perhaps unnecessarily prolix, still this fact can hardly be regarded as sufficient evidence of piracy in view of the other facts of the case. The educational fitness of the respondent was attacked,

and her proficiency in medical matters, to justify her independent use of medical terms and allusions to diseases and physiological facts, was also questioned. But I do not attach much importance to this feature of complainant's case. She testified with intelligence before the master, and in the course of her testimony stated that she had studied physiognomy since a child, acquiring knowledge upon the subject from her mother, who was somewhat conversant with the art or science; that she had always taken a great deal of interest in the subject, and had read and investigated it a great deal, and that she had read numerous books on medicine, physiology, and done much general reading. The complainant himself, it seems, as appears from the testimony, had sufficient regard for her first work, the second edition of which was published in 1881, to be the means of its introduction in two libraries in Australia, while he was traveling there. Some correspondence that passed between the parties relating to this was introduced. If he considered that she had pirated from his works, it is somewhat strange that he should have so generously promoted her interest as an author. Another significant fact, which tends to show that complainant did not regard respondent's first work very seriously, is that he failed to institute any proceedings against her for fully 11 years. The second edition of her first work was published in 1881, and yet his suit was not filed until 1892, when he also, on the same day, filed his bill against the second work of two volumes, published in 1890.

In the view I take of the claim of piracy, it is unnecessary to enter into any further discussion of the contentions of the parties. It is my opinion that, while the respondent did consult and use complainant's works, she has not drawn from them to a substantial degree; that such use as she did make may properly come within the designation of fair use; that, as to other features of these rival works common to all of the books, she obtained these from sources other than complainant's works, and to which the latter had no copyright. In other words, I am not satisfied that respondent's literary efforts are not the result, for the most part, of her own independent thoughts and studies and research. The bills will therefore be dismissed.