12-2412 (L)
Swatch Group v. Bloomberg

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2013

(Argued: October 21, 2013                    Decided: January 27, 2014

Amended: May 30, 2014)

Docket Nos. 12-2412-cv, 12-2645-cv

_____

THE SWATCH GROUP MANAGEMENT SERVICES LTD.,

*Plaintiff-Counter-Defendant-Appellant-Cross-Appellee,*

—v.—

BLOOMBERG L.P.,

*Defendant-Counter-Claimant-Appellee-Cross-Appellant.*

_____

Before:

KATZMANN, *Chief Judge*, KEARSE and WESLEY, *Circuit Judges*.

_____

Appeal and cross-appeal from a judgment of the United States District Court for the Southern District of New York (Hellerstein, *J.*), granting summary judgment to the defendant as to the plaintiff's claim of copyright infringement on the ground that the defendant had engaged in fair use. The plaintiff claims that the defendant, a financial news and data reporting service, infringed the plaintiff's copyright in a sound recording of a foreign public company's earnings call with invited investment analysts by obtaining a copy of the recording without authorization and making it available to the defendant's paying subscribers. We hold, upon consideration of the relevant factors, *see* 17 U.S.C. § 107, that the defendant's use qualifies as fair use. We further grant the plaintiff's motion to dismiss the defendant's cross-appeal because the defendant lacks appellate standing and we lack appellate jurisdiction.

For the reasons stated below, the defendant's cross-appeal is **DISMISSED**, and the judgment of the district court is **AFFIRMED**.

———————————

JOSHUA PAUL (Jess M. Collen, Kristen Mogavero, *on the brief*), COLLEN IP, Ossining, NY, *for Plaintiff-Counter-Defendant-Appellant-Cross-Appellee*.

JOHN M. DIMATTEO (Thomas H. Golden, Amina Jafri, *on the brief*), Willkie Farr & Gallagher LLP, New York, NY, *for Defendant-Counter-Claimant-Appellee-Cross-Appellant*.

———————————

KATZMANN, *Chief Judge*:

This case concerns the scope of copyright protection afforded to a sound recording of a conference call convened by The Swatch Group Ltd. ("Swatch Group"), a foreign public company, to discuss the company's recently released

earnings report with invited investment analysts. In particular, we must determine whether Defendant-Appellee Bloomberg L.P. ("Bloomberg"), a financial news and data reporting service that obtained a copy of that sound recording without authorization and disseminated it to paying subscribers, may avoid liability for copyright infringement based on the affirmative defense of "fair use." 17 U.S.C. § 107. We also must determine whether we have jurisdiction to hear Bloomberg's cross-appeal on the issue of whether the sound recording of the conference call is copyrightable in the first instance.

Plaintiff-Appellant The Swatch Group Management Services Ltd. ("Swatch"), a subsidiary of Swatch Group, appeals from a judgment of the United States District Court for the Southern District of New York (Hellerstein, *J.*), which *sua sponte* granted summary judgment to Bloomberg on Swatch's claim of copyright infringement on the ground of fair use. On appeal, Swatch argues that the district court's ruling was premature because Swatch had not yet had the opportunity to take discovery on three issues: (1) whether Bloomberg obtained and disseminated the sound recording for the purpose of "news reporting" or for some other business purpose; (2) Bloomberg's state of mind when it obtained

3

and disseminated the recording; and (3) whether Bloomberg subscribers actually listen to sound recordings of earnings calls, or instead glean information about such calls by reading written transcripts or articles. Swatch also contends that the district court erroneously concluded that Swatch had published the sound recording before Bloomberg disseminated it. More broadly, Swatch argues that the district court erred in how it evaluated and balanced the various considerations relevant to fair use. For the reasons set forth below, we agree with the district court and hold that, upon consideration of the relevant factors and resolving all factual disputes in favor of Swatch, Bloomberg has engaged in fair use.

In addition, Bloomberg cross-appeals from the same judgment of the district court, urging us to hold that Swatch's sound recording is not protected by the copyright laws in the first place. Swatch has moved to dismiss the cross-appeal on the grounds that Bloomberg lacks appellate standing and we lack appellate jurisdiction. That motion is granted. Because the judgment designated in Bloomberg's notice of appeal was entered in Bloomberg's favor, Bloomberg is not "aggrieved by the judicial action from which it appeals," *Great Am. Audio*

*Corp. v. Metacom, Inc.*, 938 F.2d 16, 19 (2d Cir. 1991), and therefore lacks standing. Similarly, although the district court later dismissed as moot Bloomberg's counterclaim for a declaration that Swatch's copyright is invalid, Bloomberg never filed an additional notice of appeal identifying that subsequent order as the subject of an appeal, and thus we have no jurisdiction to review it.

Accordingly, we affirm the judgment of the district court, and we dismiss the cross-appeal.

## BACKGROUND

### I. Factual Background

The following facts are drawn from the record before the district court and are undisputed unless otherwise noted.

On February 8, 2011, Swatch Group released its 2010 earnings report, a seven-page compilation of financial figures and textual narrative about the company's financial performance during the prior year. Because Swatch Group is incorporated in Switzerland and its shares are publicly traded on the Swiss stock exchange, Swatch Group is governed by Swiss securities law and the listing rules of the Swiss exchange. In accordance with those rules, Swatch Group filed its

5

earnings report with the exchange before trading opened for the day, and simultaneously posted the report in four languages (English, German, French, and Italian) on the Investor Relations section of its website.

After it released this information to the public, Swatch Group held a conference call with an invited group of financial analysts, as is its custom. Swiss law permits public companies to hold this kind of earnings call with a limited group of analysts, provided that the company does not disclose non-public, significantly price-sensitive facts during the call. Before the call, Swatch Group sent invitations to all 333 financial analysts who had registered in advance with Swatch Group's Investor Relations Department. In accordance with its practice, Swatch Group did not invite members of the press. Swatch Group held the call at 2 p.m. local Swiss time, several hours after it had released the earnings report, in order to allow European, American, and Asian analysts to participate. In the end, approximately 132 analysts joined the call. For Swatch Group's part, its Chief Executive Officer, Chief Financial Officer, and three other senior executives participated in the call from the company's offices in Switzerland.

At Swatch Group's request, an audio conferencing vendor recorded the entire earnings call as it was in progress. At the beginning of the call, an operator affiliated with the vendor welcomed the analysts to the call and told them, "This call must not be recorded for publication or broadcast." J.A. 22. Swatch Group's executives then provided commentary about the company's financial performance and answered questions posed by fifteen of the analysts. The entire call lasted 132 minutes; Swatch Group executives spoke for approximately 106 of those minutes.

Neither Bloomberg nor any other press organization was invited to the earnings call. Nevertheless, within several minutes after the call ended, Bloomberg obtained a sound recording and written transcript of the call and made them both available online, without alteration or editorial commentary, to subscribers to its online financial research service known as Bloomberg Professional. According to Bloomberg's promotional materials, Bloomberg Professional provides "[a] massive data stream" with "rich content" that is "unparalleled in scope and depth" and is "delivered to your desktop in real time," as well as "access to all the news, analytics, communications, charts,

7

liquidity, functionalities and execution services that you need to put knowledge into action." *Id.* 640.

On February 10, 2011, after Swatch Group learned that the recording and transcript had been made available on Bloomberg terminals, Swatch Group sent Bloomberg a cease-and-desist letter demanding that they be removed. Bloomberg refused. On February 14, 2011, Swatch then filed its initial complaint against Bloomberg in this action claiming infringement of its copyright in the sound recording of the earnings call. In an agreement signed by representatives of Swatch Group and Swatch on February 14 and 15, 2011, Swatch Group assigned its interest in the copyright to its subsidiary Swatch.

Two weeks later, on March 2, 2011, Swatch filed an application with the U.S. Copyright Office to register a copyright in a sound recording of the earnings call. The Copyright Office and Swatch then exchanged a series of emails over the scope of the claimed copyright. After Swatch narrowed the copyright to cover only the statements made by Swatch Group executives, and not the statements made by the operator or the questions posed by the analysts, the Copyright Office issued a registration on April 27, 2011.

*II.    Procedural History*

As stated, Swatch filed its initial complaint in this action on February 14, 2011. Swatch then twice amended its complaint; the operative pleading thus is the Second Amended Complaint, filed on May 10, 2011. The Second Amended Complaint alleges that, by recording the earnings call and making the recording available to the public, Bloomberg infringed Swatch's exclusive rights "to reproduce the copyrighted work" and "to distribute copies or phonorecords of the work to the public." 17 U.S.C. § 106(1), (3). Swatch does not challenge Bloomberg's preparation or distribution of the written transcript of the earnings call.[1]

On May 20, 2011, Bloomberg moved under Rule 12(b)(6) to dismiss the Second Amended Complaint for failure to state a claim, arguing *inter alia* that the earnings call was not copyrightable in the first place and that Bloomberg's copying and dissemination of the call was fair use. The district court denied that motion in an order entered on August 30, 2011. *Swatch Grp. Mgmt. Servs. Ltd. v.*

---

[1] Swatch has disclaimed any such challenge in light of 17 U.S.C. § 114(b), under which a copyright owner's right to prepare derivative works based on a sound recording "is limited to the right to prepare a derivative work in which the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in sequence or quality."

*Bloomberg L.P.* ("*Swatch I*"), 808 F. Supp. 2d 634 (S.D.N.Y. 2011). The district court found that the recording was copyrightable, *id.* at 638–39, and declined to address the "fact-intensive" questions implicated by Bloomberg's fair use defense on a motion to dismiss, *id.* at 641.

At an in-court conference held two weeks later on September 16, 2011, however, the district court informed the parties of its belief that it could resolve the case through a motion for judgment on the pleadings, and directed Swatch to file such a motion. Swatch moved as directed on October 21, 2011, and Bloomberg opposed. The district court held oral argument on December 12, 2011, at which it denied Swatch's motion and explained that, in the court's view, "defendant's use qualifies as fair use." J.A. 581. Later that day, the district court issued a summary order stating that it had "preliminarily granted judgment to Defendant on the basis that if Defendant's alleged actions constitute infringement, they are protected as fair use." *Id.* 584. The order directed Swatch to submit "a brief regarding the existence of any triable issues of material fact with respect to Defendant's fair use affirmative defense." *Id.* Swatch did so, pointing out that it had taken no discovery in the action.

In an opinion and order entered on May 17, 2012, the district court *sua sponte* granted summary judgment to Bloomberg, finding that Bloomberg's copying and dissemination of the recording qualify as fair use. *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.* ("*Swatch II*"), 861 F. Supp. 2d 336 (S.D.N.Y. 2012). On May 18, 2012, the clerk of the district court entered judgment "in favor of defendant." J.A. 7.

On June 14, 2012, Swatch filed a timely notice of appeal from that judgment. On June 28, 2012, Bloomberg filed a notice of cross-appeal from the same judgment, and on July 24, 2012, Swatch moved to dismiss the cross-appeal. On August 27, 2012, after the parties had filed a stipulation of dismissal without prejudice to reinstatement under Local Rule 42.1, the district court issued an order dismissing as moot all of Bloomberg's counterclaims, including a counterclaim seeking a declaration that Swatch's copyright is invalid. On November 13, 2012, upon receipt of a letter from Swatch, the Clerk reinstated the appeal. Finally, on January 14, 2013, the motions panel of this Court referred Swatch's motion to dismiss the cross-appeal to the merits panel.

**DISCUSSION**

We review a district court's grant of summary judgment *de novo*, resolving all ambiguities and drawing all reasonable inferences against the moving party. *See Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 63–64 (2d Cir. 2012). Summary judgment is appropriate only where the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under Federal Rule of Civil Procedure 56(f), district courts have discretion to grant summary judgment *sua sponte* "[a]fter giving notice and a reasonable time to respond" and "after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f), (f)(3); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that [it] had to come forward with all of [its] evidence."). Before granting summary judgment *sua sponte*, however, a district court "must assure itself that following the procedures set out in Rule 56[(a)–(e)] would not alter the outcome." *Ramsey v. Coughlin*, 94 F.3d 71, 74 (2d Cir. 1996). In other words,

"[d]iscovery must either have been completed, or it must be clear that further discovery would be of no benefit," such that "the record . . . reflect[s] the losing party's inability to enhance the evidence supporting its position and the winning party's entitlement to judgment." *Id.*[2]

I.      *Fair Use*

The Copyright Act of 1976 grants copyright holders a bundle of exclusive rights, including the rights to "reproduce, perform publicly, display publicly, prepare derivative works of, and distribute copies of" the copyrighted work. *Arista Records LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010) (citing 17 U.S.C. § 106). Because copyright law recognizes the need for "breathing space," *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994), however, a defendant who otherwise would have violated one or more of these exclusive rights may avoid liability if he can establish that he made "fair use" of the copyrighted material. Though of common-law origin, the doctrine of fair use is now

---

[2] Although *Ramsey* was decided before Rule 56 was amended in 2010 to provide express procedures governing the grant of summary judgment independent of a motion, its statements regarding the care a district court must take before *sua sponte* granting summary judgment remain good law. *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) ("Subdivision (f) brings into Rule 56 text a number of related procedures that have grown up in practice.").

13

recognized at 17 U.S.C. § 107, which provides that "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright."

To evaluate whether a particular use qualifies as "fair use," we must engage in "an open-ended and context-sensitive inquiry." *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006). The Copyright Act directs that, in determining whether a particular use is fair, "the factors to be considered shall include":

> (1)    the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2)    the nature of the copyrighted work;
>
> (3)    the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4)    the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. Though mandatory, these four factors are non-exclusive. Moreover, "[a]lthough defendants bear the burden of proving that their use was fair, they need not establish that each of the factors set forth in § 107 weighs in their favor." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476–77 (2d Cir. 2004)

14

(internal citation omitted). Rather, "[a]ll [factors] are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578.

The determination of fair use is a mixed question of fact and law. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985). While we have reversed district courts that too hastily resolved factual questions relevant to fair use on summary judgment, *see, e.g., Ringgold v. Black Entm'nt Television, Inc.*, 126 F.3d 70, 81 (2d Cir. 1997), "this [C]ourt has on a number of occasions resolved fair use determinations at the summary judgment stage where there are no genuine issues of material fact." *Blanch*, 467 F.3d at 250 (quoting *Castle Rock Entm't, Inc. v. Carol Publ'g Grp.*, 150 F.3d 132, 137 (2d Cir. 1998)) (ellipsis omitted).

A. Purpose and Character of Use

We turn first to "the purpose and character of the use." 17 U.S.C. § 107(1). Below, the district court found that this factor favored fair use because "[Bloomberg]'s work as a prominent gatherer and publisher of business and financial information serves an important public interest, for the public is served

15

by the full, timely and accurate dissemination of business and financial news." *Swatch II*, 861 F. Supp. 2d at 340.

Swatch argues that this conclusion was error for several reasons. First, Swatch contends that the district court improperly accepted Bloomberg's unsubstantiated claim that it had engaged in "news reporting." Swatch notes that Bloomberg itself has characterized its Bloomberg Professional service as delivering both financial "news" and "data," and argues that the district court erred in denying Swatch the chance to develop facts in discovery to show that the sound recording at issue here is the latter and not the former. Similarly, Swatch argues that the district court improperly denied Swatch the chance to develop facts relevant to Bloomberg's state of mind. Swatch acknowledges that the district court "credited [Swatch]'s allegations that [Bloomberg] was not authorized to access the Earnings Call and that [Bloomberg]'s publication of the Infringing Work violated [Swatch Group's] directive," *Swatch II*, 861 F. Supp. 2d at 343, but argues that Swatch should have been able to take discovery into whether Bloomberg *knew* at the time that obtaining and publishing the recording violated Swatch Group's directive. Swatch also argues that it should have been

16

permitted to take discovery into whether Bloomberg Professional subscribers actually choose to access information about earnings calls by listening to recordings, or instead choose to read written transcripts or articles. More broadly, Swatch argues that the district court gave insufficient weight to the fact that Bloomberg's use was commercial and did not transform the underlying recording.

We find these arguments unpersuasive and hold that the first statutory factor favors fair use here. To begin with, whether one describes Bloomberg's activities as "news reporting," "data delivery," or any other turn of phrase, there can be no doubt that Bloomberg's purpose in obtaining and disseminating the recording at issue was to make important financial information about Swatch Group available to investors and analysts. That kind of information is of critical importance to securities markets. Indeed, as Bloomberg points out, the Securities and Exchange Commission ("SEC") has mandated that when American companies disclose this kind of material nonpublic information, they must make it available to the public immediately. *See* Regulation FD, 17 C.F.R. § 243.100. At a minimum, such public dissemination of financial information serves this public

purpose in the nature of news reporting. *See Harper & Row*, 471 U.S. at 561

("News reporting is one of the examples enumerated in § 107 to 'give some idea

of the sort of activities the courts might regard as fair use under the

circumstances.'" (quoting S. Rep. No. 94-473, at 61 (1975)).

Seizing on Bloomberg's citation to Regulation FD, Swatch protests that in

crafting that regulation, the SEC expressly exempted "foreign private issuer[s]"

like Swatch Group that are "incorporated or organized under the laws of [a]

foreign country." 17 C.F.R. §§ 243.101(b), 230.405. In fact, as initially proposed,

Regulation FD would have applied to such issuers, *see* Selective Disclosure and

Insider Trading, 64 Fed. Reg. 72,590, 72,597 (Dec. 28, 1999), but the SEC

ultimately "determined to exempt foreign private issuers . . . as it has in the past

exempted them from certain U.S. reporting requirements such as Forms 10-Q

and 8-K," Selective Disclosure and Insider Trading, 65 Fed. Reg. 51,716, 51,724

(Aug. 24, 2000). Swatch thus argues that giving weight to a public interest in the

dissemination of important financial information in this case would in effect

erase foreign issuers' exemption from Regulation FD and set up organizations

like Bloomberg as private enforcers of U.S. public disclosure rules.

18

This argument, however, misattributes to Regulation FD a role in the law of copyright. That regulation is relevant here only insofar as it provides additional support for a proposition that would be clear in any event: Investors and analysts have an interest in obtaining important financial information about companies whose securities are traded in American and other markets. The fact that the SEC has chosen not to require foreign issuers to follow certain disclosure rules imposed on domestic issuers in no way implies that information about foreign issuers is irrelevant. Accordingly, contrary to Swatch's suggestion, nothing in our decision today subjects Swatch Group or any other foreign issuer to the requirements of Regulation FD. Nor do we hold that a foreign issuer's failure to follow Regulation FD prevents it from enforcing its copyrights in the United States. We merely hold that where a financial research service obtains and disseminates important financial information about a foreign company in order to make that information available to investors and analysts, that purpose lends support to a finding of fair use.

Swatch also stresses the commercial nature of Bloomberg's use. Section 107 expressly directs courts to consider whether the use "is of a commercial nature or

is for nonprofit educational purposes," 17 U.S.C. § 107(1), and we have said that "[t]he greater the private economic rewards reaped by the secondary user (to the exclusion of broader public benefits), the more likely the first factor will favor the copyright holder and the less likely the use will be considered fair." *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994). It is undisputed here that Bloomberg is a commercial enterprise and that Bloomberg Professional is a subscription service available to paying users. At the same time, we have recognized that "[a]lmost all newspapers, books and magazines are published by commercial enterprises that seek a profit," *Consumers Union of U.S., Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983), and have discounted this consideration where "the link between [the defendant]'s commercial gain and its copying is . . . attenuated" such that it would be misleading to characterize the use as "commercial exploitation." *Am. Geophysical Union*, 60 F.3d at 922; *see also Campbell*, 510 U.S. at 594 (holding that "[i]t was error for the Court of Appeals to conclude that the commercial nature of [a secondary work] rendered it presumptively unfair").

Here, Swatch does not contest that Bloomberg Professional is a multifaceted research service, of which disseminating sound recordings of earnings calls is but one small part. Moreover, it would strain credulity to suggest that providing access to Swatch Group's earnings call more than trivially affected the value of that service. So while we will not ignore the commercial nature of Bloomberg's use, we assign it relatively little weight.

Swatch also contends that Bloomberg acted in bad faith and that this should count against it. Regardless of what role good or bad faith plays in fair use analysis, *see Blanch*, 467 F.3d at 255–56, we need not tarry over it here. Even assuming that Bloomberg was fully aware that its use was contrary to Swatch Group's instructions, Bloomberg's overriding purpose here was not to "scoop[]" Swatch or "supplant the copyright holder's commercially valuable right of first publication," *Harper & Row*, 471 U.S. at 562, but rather simply to deliver newsworthy financial information to investors and analysts. That kind of activity, whose protection lies at the core of the First Amendment, would be crippled if the news media and similar organizations were limited to sources of

information that authorize disclosure. *See generally New York Times Co. v. United States*, 403 U.S. 713 (1971).

The Supreme Court has also instructed courts analyzing the first fair use factor to consider the transformativeness of the use—that is, whether "the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579 (internal citations, quotation marks, and alterations omitted). While a transformative use generally is more likely to qualify as fair use, "transformative use is not absolutely necessary for a finding of fair use." *Id.*; *see also Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) (finding a non-transformative use to be a fair use).

In the context of news reporting and analogous activities, moreover, the need to convey information to the public accurately may in some instances make it desirable and consonant with copyright law for a defendant to faithfully reproduce an original work without alteration. Courts often find such uses transformative by emphasizing the altered purpose or context of the work, as

evidenced by surrounding commentary or criticism. *See, e.g.*, *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609–610 (2d Cir. 2006); *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 22–23 (1st Cir. 2000). Here, Bloomberg provided no additional commentary or analysis of Swatch Group's earnings call. But by disseminating not just a written transcript or article but an actual sound recording, Bloomberg was able to convey with precision not only the raw data of the Swatch Group executives' words, but also more subtle indications of meaning inferable from their hesitation, emphasis, tone of voice, and other such aspects of their delivery. This latter type of information may be just as valuable to investors and analysts as the former, since a speaker's demeanor, tone, and cadence can often elucidate his or her true beliefs far beyond what a stale transcript or summary can show. As courts have long recognized in the context of witness testimony, "'a cold transcript contains only the dead body of the evidence, without its spirit,'" and "cannot reveal . . . '[the speaker's] hesitation, his doubts, his variations of language, his confidence or precipitancy, his calmness or consideration.'" *Zhou Yun Zhang v. INS*, 386 F.3d 66, 73–74 (2d Cir. 2004) (quoting *Regina v. Bertrand*, L.R. [1867] 1 L.R.P.C. 520, 535), *overruled on*

23

*other grounds by Shi Liang Lin v. U.S. Dep't of Justice*, 494 F.3d 296, 305 (2d Cir. 2007).

Furthermore, a secondary work "can be transformative in function or purpose without altering or actually adding to the original work." *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009) (holding that making an exact digital copy of a student's thesis for the purpose of determining whether it included plagiarism is a fair use); *see also Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (holding that a search engine's publication of low-resolution, thumbnail copies of copyrighted images was "highly transformative" because the thumbnails were "incorporate[ed] . . . into a new work, namely, an electronic reference tool"). Here, notwithstanding that the data disseminated by Bloomberg was identical to what Swatch Group had disseminated, the two works had different messages and purposes. To begin with, while Swatch Group purported to convey true answers to the analysts' questions and to justify the propriety and reliability of its published earnings statement, Bloomberg made no representation one way or another as to whether the answers given by Swatch Group executives were true or reliable. Nor did

Bloomberg purport to support the propriety or reliability of Swatch Group's earnings statement. Bloomberg was simply revealing the newsworthy information of what Swatch Group executives had said. Bloomberg's message— "This is what they said"—is a very different message from Swatch Group's— "This is what you should believe."

Moreover, Swatch Group intended to exclude members of the press and to restrict the information supplied by its executives to a relatively small group of analysts who had identified themselves to the company in advance. Bloomberg's objective in rebroadcasting the call, by contrast, was to make this information public, defeating Swatch Group's effort to restrict access. Bloomberg's purpose, in other words, was to publish this factual information to an audience from which Swatch Group's purpose was to withhold it. These differences give Bloomberg's use at least an arguably transformative character.

In any event, regardless of how transformative the use is, we conclude that the first fair use factor, focusing on the purpose and character of the secondary use, favors fair use. We of course recognize that a news reporting purpose by no means guarantees a finding of fair use. *See Harper & Row*, 471 U.S. at 557. After

all, "[t]he promise of copyright would be an empty one if it could be avoided merely by dubbing the infringement a fair use 'news report.'" *Id.* A news organization thus may not freely copy creative expression solely because the expression itself is newsworthy. Nevertheless, we agree with the district court's conclusion that, under the unusual circumstances of this case, the purpose and character of Bloomberg's unaltered dissemination of Swatch Group's expression weighs in favor of fair use, for two reasons.

First, as noted above, by disseminating a full, unadulterated recording of the earnings call, Bloomberg was able to convey valuable factual information that would have been impaired if Bloomberg had undertaken to alter the speech of the Swatch Group executives by interjecting its own interpretations. As we explained in a fair use case involving verbatim copying of a written work, "[w]here an evaluation or description is being made, copying the exact words may be the only valid way precisely to report the evaluation." *Consumers Union*, 724 F.2d at 1049–50; *see also Harper & Row*, 471 U.S. at 563 (noting that direct copying may in some instances be "necessary adequately to convey the facts"). So too here, copying the exact spoken performance of Swatch Group's executives

was reasonably necessary to convey their full meaning. Bloomberg's faithful reproduction thus served "the interest of accuracy, not piracy." *Consumers Union*, 724 F.2d at 1049.

Second, Bloomberg's use did no harm to the legitimate copyright interests of the original author. Importantly, Swatch has admitted that it "did not seek to profit from the publication of the February 8, 2011 Earnings Call in audio or written format." J.A. 294. The copyright-protected aspects of the earnings call—that is, the manner by which the facts were expressed—thus were of no value to Swatch or Swatch Group except insofar as they served to convey important information to the analysts in attendance. But Bloomberg's copying of the Swatch Group executives' words, as needed to communicate factual information about the company's earnings report, in no way diminished Swatch Group's ability to communicate with analysts, and thus caused no harm to Swatch's copyright interests. In this way, the case at bar stands in stark contrast to a case like *Harper & Row*, where a magazine disseminated an unpublished excerpt of President Ford's memoirs. *See Harper & Row*, 471 U.S. at 542. This kind of gun-jumping, which scooped the publication of the copyrighted work and, in doing so, did

considerable harm to the value of the original author's copyright, is not present here.

Our prior decisions in *Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*, 166 F.3d 65 (2d Cir. 1999), *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91 (2d Cir. 1977), and *Financial Information, Inc. v. Moody's Investors Service, Inc. ("FII")*, 751 F.2d 501 (2d Cir. 1984), on which Swatch relies, are not to the contrary. In those cases, we rejected fair use arguments pressed by defendants who purported to be serving the public by providing access to important financial information. In *Nihon* and *Wainwright*, we stressed that the defendants had not supplemented or otherwise transformed the plaintiffs' works. Instead, they had simply translated Japanese business articles into English, *Nihon*, 166 F.3d at 69, or recounted the critical conclusions from research reports about major industrial and financial corporations, *Wainwright*, 558 F.2d at 93 & n.1. In *FII*, we rejected a fair use defense by a ratings agency that had copied information about municipal bond redemptions compiled by a competing financial publisher. *FII*, 751 F.2d at 502–03. Criticizing the district court's conclusion that the defendant's use served a "public function," we stated that to

28

so hold "would, it seems to us, state a rule that whenever there is a market for information, the paid delivery of goods to that market rises to a public function." *Id.* at 509. We rejected such a rule, finding that it would "distort" proper fair use analysis. *Id.*

In all three of those cases, however, the defendants attempted to use the banner of newsworthiness to supersede the core objects of original works whose production critically depended upon copyright protection. Finding fair use in those cases would have severely impeded the ability of news and research organizations to obtain payment for their expression, imperiling the economic foundation of vital industries. But unlike the arguments we rejected in *Nihon*, *Wainwright*, and *FII*, our decision today does not rest upon the newsworthiness of the original expression alone. To the contrary, we also place great weight on the absence of harm to the original author's legitimate copyright interests. Swatch's reliance on our prior cases is thus misplaced.

The discovery Swatch seeks would not alter our analysis. With respect to the request for discovery into whether Bloomberg delivered "news" or "data" to its subscribers, such a distinction raises a semantic rather than factual dispute. It

29

is undisputed that Bloomberg gave subscribers access to the full, unaltered sound recording of Swatch Group's earnings call as part of its paid financial research service. That is sufficient for present purposes. There is likewise no need for further discovery into Bloomberg's good or bad faith, since resolving that issue in Swatch's favor would not affect the outcome of our analysis. We also see no need to resolve how many of Bloomberg's subscribers chose to listen to the sound recording in question rather than read a written transcript or article. As we have explained, because the sound recording conveys information that a transcript or article cannot, the recording has independent value, regardless of how many Bloomberg subscribers chose to avail themselves of that independent value in this instance.

This first factor accordingly favors fair use.

B. Nature of the Copyrighted Work

The second statutory fair use factor concerns "the nature of the copyrighted work." 17 U.S.C. § 107(2). This factor accounts for the fact that "some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former

30

works are copied." *Campbell*, 510 U.S. at 586. As relevant here, this factor requires us to consider the extent of Swatch's copyright in the recording—the "thickness" or "thinness" of Swatch's exclusive rights—as well as whether or not the recording had been published at the time of Bloomberg's use. *See id.* (citing cases). The district court determined that this factor favored fair use because Swatch's copyright was "at best . . . 'thin'" and because "the first publication of Swatch Group's expression occurred prior to [Bloomberg]'s publication of the Infringing Work." *Swatch II*, 861 F. Supp. 2d at 341.

Swatch argues that the district court erred in concluding that the recording had been published. Swatch points out that the Copyright Act contemplates two methods of publishing an audio recording: "the distribution of . . . phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending," or "offering to distribute . . . phonorecords to a group of persons for purposes of further distribution, public performance, or public display." 17 U.S.C. § 101 (defining "publication"). "Phonorecords," in turn, are defined as "material objects in which sounds . . . are fixed . . . and from which the sounds can be perceived, reproduced, or otherwise communicated." *Id.* Applying these

definitions, Swatch contends that the sound recording of the earnings call has never been published. Simply put, Swatch has never, before or after Bloomberg's use, "distribut[ed]" a CD or other "material object" embodying the spoken commentary on the earnings call "to the public," nor has it ever "offer[ed] to distribute" a phonorecord of the call to any "group of persons for purposes of further distribution, public performance, or public display."

Swatch is unquestionably correct that the earnings call is unpublished under the definition of "publication" set forth in § 101. But that technical definition does not control our analysis of this aspect of the second fair use factor. While we will consider the statutory definition, we also will not blind ourselves to the fact that Swatch Group invited over three hundred investment analysts from around the globe to the earnings call, out of which over a hundred actually attended. Thus, even though the sound recording remains statutorily unpublished, it is clear that Swatch was not deprived of the ability to "control the first public appearance of [its] expression," including "when, where, and in what form" it appeared. *Harper & Row*, 471 U.S. at 564.

Swatch insists that because the definitions in § 101 by their terms apply for all purposes under the Copyright Act "[e]xcept as otherwise provided in this title," 17 U.S.C. § 101, the statutory definition of "publication" must control. Not so. While in general, "[s]tatutory definitions control the meaning of statutory words," *Burgess v. United States*, 553 U.S. 124, 129 (2008) (quoting *Lawson v. Suwanee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949)), in this case, no variant of the word "publish" appears in the text of the second fair use factor in § 107. Whether or not a work was published thus enters into our analysis of this factor as a judicial gloss on "the nature of the copyrighted work." That gloss, of course, is firmly grounded in fair use's common law origins and the legislative history of the 1976 Copyright Act. *See Harper & Row*, 471 U.S. at 552–54.

To the extent the text of § 107 mentions publication, it is only in a closing proviso cautioning that "[t]he fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors." Congress added this proviso to § 107 in 1992, *see* Pub. L. No. 102-492, 106 Stat. 3145 (1992), to clarify, in response to certain decisions of this Court, that there is no "per se rule barring any fair use of unpublished works." H.R. Rep.

33

No. 102-836, at 4, 9 (1992) (discussing *New Era Publications International, ApS v. Henry Holt & Co., Inc.*, 873 F.2d 576 (2d Cir. 1989), and *Salinger v. Random House, Inc.*, 811 F.2d 90 (2d Cir. 1987)). This proviso in no way limits our consideration of a work's publication status to the statutory definition of "publication" in § 101. To the contrary, the proviso directs that if we find a work to be "unpublished," however that term is understood, our analysis of the four statutory factors, including "the nature of the copyrighted work," cannot end there.

Limiting our consideration of a work's publication status to the statutory definition, moreover, would obscure the different purposes served by the statutory definition and the judicial gloss on "the nature of the copyrighted work" in the context of fair use. The statutory concept of "publication" serves numerous purposes, such as triggering the requirement to deposit a copy with the Library of Congress, *see* 17 U.S.C. § 407, measuring the copyright term for certain categories of works, *see id.* § 302(c)–(e), setting the circumstances under which works by foreign authors are protected, *see id.* § 104(b), and determining the legal effect of registration, *see id.* §§ 410(c), 412. *See also* 1 Nimmer on Copyright § 4.01 (explaining the significance of publication). Publication as a

34

judicial gloss on "the nature of the copyrighted work," by contrast, aims to take account of "the author's right to control the first public appearance of his expression," *Harper & Row*, 471 U.S. at 564, which in turn forms part of our "open-ended and context-sensitive inquiry" into whether allowing the use in question would serve the goals of copyright, *Blanch*, 467 F.3d at 251.

This is not the first time that we have found that the second statutory factor favors fair use even though the work in question was technically unpublished under the statutory definition, *see Diamond v. Am-Law Pub. Corp.*, 745 F.2d 142, 144, 148 (2d Cir. 1984), and courts in fact commonly look past the statutory definition when considering this issue, *see, e.g.*, *Rotbart v. J.R. O'Dwyer Co., Inc.*, No. 94 Civ. 2091 (JSM), 1995 WL 46625, at *4 (S.D.N.Y. Feb. 7, 1995) (finding that an unfixed, undisseminated talk, delivered publicly, had been "de facto published" for purposes of fair use); *see also* 4 Nimmer on Copyright § 13.05 [A][2][b][ii] ("If the author does not seek confidentiality, fair use is not necessarily precluded even as to an unpublished work.").[3] We accordingly agree

---

[3] Indeed, in discussing the relevance of publication to fair use in *Harper & Row*, the Supreme Court indicated that "even substantial quotations might qualify as fair use in a review of a published work or a news account of a speech that had been delivered to the public or disseminated to the press." 471 U.S. at 564. Like the conference call at issue

with the district court that although the sound recording is statutorily

unpublished, because Swatch Group publicly disseminated the spoken

performance embodied in the recording before Bloomberg's use, the publication

status of the work favors fair use.

Swatch does not challenge the district court's determination that Swatch's

copyright in the earnings call is "at best . . . 'thin,'" *Swatch II*, 861 F. Supp. 2d at

341, nor could it. It is well established that "the scope of fair use is greater with

respect to factual than non-factual works." *New Era Publ'ns*, 904 F.2d at 157.

Moreover,

> [e]ven within the field of fact works, there are gradations as to the
> relative proportion of fact and fancy. One may move from sparsely
> embellished maps and directories to elegantly written biography.
> The extent to which one must permit expressive language to be
> copied, in order to assure dissemination of the underlying facts, will
> thus vary from case to case.

*Harper & Row*, 471 U.S. at 563 (quoting Robert A. Gorman, *Fact or Fancy? The*

*Implications for Copyright*, 29 J. Copyright Soc'y 560, 561 (1982)).

There can be no doubt as to the manifestly factual character of the earnings

call in this case. The entire copyrighted portion of the call consists of Swatch

---

here, a publicly delivered speech would not, by the mere fact of its public delivery, be
"publi[shed]" under § 101.

Group executives explaining the company's financial performance and outlook to a group of investment analysts. And while we assume without deciding in this appeal that the call contained sufficient original expression—in the form of the executives' tone, cadence, accents, and particular choice of words—to be copyrightable, the purpose of the call was not in any sense to showcase those forms of expression. Rather, the call's sole purpose was to convey financial information about the company to investors and analysts.[4]

In light of the thinness of Swatch's copyright, as well as Swatch Group's prior dissemination of its executives' expression, we find that the second statutory factor favors fair use.

---

[4] Even the portions of the call Swatch quotes as demonstrating the originality of the executives' statements are overwhelmingly factual in nature. Swatch points to the following passage, for example:

> So we're not looking desperately for someone else, but I can tell you that there are many companies out there who would like to benefit from the products, the[] know how, the management capabilities of Swatch Group.

> And you should ask the other companies out there, even big players, if they would not think that—being part of The Swatch Group, they will do much better. Look at the results and margins and what they are doing, look at the regional trends, I think you would find many of them.

Appellant's Br. 9 (quoting J.A. 153 at 37:25–38:43).

C.  Amount and Substantiality of the Portion Used

We turn now to "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). This factor asks whether "the quantity and value of the materials used are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586 (internal citations and quotation marks omitted). In general, "the more of a copyrighted work that is taken, the less likely the use is to be fair." *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 109 (2d Cir. 1998). It is undisputed here that Bloomberg used the entire work. The district court acknowledged that "this generally weighs against fair use," but found that the public interest in the information contained in the recording "is better served by the dissemination of that information in its entirety, including the incidents of oral speech that do not translate onto the page but color the purely factual content." *Swatch II*, 861 F. Supp. 2d at 342.

Swatch argues that the district court improperly resolved this factor in Bloomberg's favor because, as it also argued with respect to the first fair use factor, there are genuine disputes of material fact regarding whether Bloomberg

38

subscribers glean information about earnings calls by listening to audio recordings or instead by reading a written transcript or article.

We are unpersuaded. As an initial matter, we do not understand the district court to have affirmatively weighed the third statutory fair use factor in Bloomberg's favor. Such a holding would have been novel, as "[n]either our court nor any of our sister circuits has ever ruled that the copying of an entire work *favors* fair use." *Bill Graham Archives*, 448 F.3d at 613. Rather, we believe that the district court found this factor neutral, refusing to weigh it in Swatch's favor despite Bloomberg's use of the entire recording because of the public interest in the information embodied in the recording. That holding is entirely consistent with our case law. As we have recognized, a number of courts "have concluded that such copying does not necessarily weigh against fair use because copying the entirety of a work is sometimes necessary to make a fair use." *Id.* (citing cases); *see also A.V. ex rel. Vanderhye*, 562 F.3d at 642, 645 (finding copying of an entire work to be fair use); *Perfect 10*, 508 F.3d at 1167–68 (same).

For the reasons already explained in our discussion of the first fair use factor, we agree with the district court that Bloomberg's use of the entire

recording was reasonable in light of its purpose of disseminating important

financial information to investors and analysts. The recording has independent

informational value over and above the value of a written transcript or article,

regardless of how many Bloomberg subscribers took advantage of that value in

this instance. Like the district court, we accordingly weigh this factor in neither

party's favor.

D. Effect upon the Market for or Value of the Original

The final fair use factor considers "the effect of the use upon the potential

market for or value of the copyrighted work." 17 U.S.C. § 107(4). In *Harper &*

*Row*, the Supreme Court described this factor as "undoubtedly the single most

important element of fair use." 471 U.S. at 566. This factor "requires courts to

consider not only the extent of market harm caused by the particular actions of

the alleged infringer, but also whether unrestricted and widespread conduct of

the sort engaged in by the defendant would result in a substantially adverse

impact on the potential market for the original." *Campbell*, 510 U.S. at 590

(quotation marks and alterations omitted). We have described this factor as

"requir[ing] a balancing of 'the benefit the public will derive if the use is

permitted and the personal gain the copyright owner will receive if the use is denied.'" *Bill Graham Archives*, 448 F.3d at 613 (quoting *MCA, Inc. v. Wilson*, 677 F.2d 180, 183 (2d Cir. 1981)).

The district court weighed this factor in favor of fair use, noting that "the relevant market effect is that which stems from [Bloomberg]'s use of the original expression of Swatch Group's senior officers." *Swatch II*, 861 F. Supp. 2d at 342. The district court found "[n]othing in the record [that] suggests any possible market effect stemming from [Bloomberg]'s use." *Id.* We agree, especially in view of the obvious and furthermore conceded fact that Swatch had no interest in the exploitation of the copyright-protected aspects of the call.

Swatch argues that the district court's analysis was erroneous because it again assumed that affording investors and analysts access to the recording, as opposed to a written transcript or article, served the public interest. As we have already explained, we see nothing mistaken in that finding.

Swatch also contends that it was improperly denied the opportunity to take discovery into the existence of a market for audio recordings of earnings calls conducted by foreign companies that, like Swatch Group, are exempt from

Regulation FD. Swatch has admitted that it acquired the recording without intending to profit from publishing and selling it. Any discovery thus would concern a potential market, as yet untapped by Swatch, for recordings of exempt earnings calls.

While the loss of a potential yet untapped market can be cognizable under the fourth fair use factor, the potential market here is defined so narrowly that it begins to partake of circular reasoning. As the Nimmer treatise has observed, "it is a given in every fair use case that plaintiff suffers a loss of a *potential* market if that potential is defined as the theoretical market for licensing the very use at bar." 4 Nimmer on Copyright § 13.05[A][4]. To guard against this "vice of circular reasoning," our case law limits our consideration to a use's "impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets." *Am. Geophysical Union*, 60 F.3d at 930–31. The hypothesized market for audio recordings of earnings calls convened by foreign companies that are exempt from Regulation FD cannot meet this standard.

Moreover, to the extent that a financial news or research organization might be willing to pay to obtain such recordings, we must bear in mind that

while "[t]he immediate effect of our copyright law is to secure a fair return for an 'author's' creative labor," the "ultimate aim is, by this incentive, to stimulate creativity for the general public good." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 526–27 (1994) (quoting *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975)). Here, the possibility of receiving licensing royalties played no role in stimulating the creation of the earnings call. Indeed, Swatch affirmatively argues that it does not know whether there is a potential market for this kind of recording, and cannot know without obtaining discovery from Bloomberg. Moreover, as we previously noted in relation to the first statutory fair use factor, the context of the earnings call makes perfectly plain that its purpose was to enable Swatch Group executives to disseminate financial information about the company to particular analysts in a way that they believed would be advantageous. It is that calculation of advantageousness, and not the possibility of receiving royalties, that induces Swatch Group and other similarly situated companies to hold earnings calls. *Cf. New York Mercantile Exch., Inc. v. IntercontinentalExchange, Inc.*, 497 F.3d 109, 118 (2d Cir. 2007).

Put differently, the "value" of the copyrighted expression for Swatch

Group in this case lay not in its capacity to generate licensing royalties, but rather

in its capacity to convey important information about the company to the

investment analysts in attendance. Bloomberg's use in no way diminishes that

value. At most, Bloomberg's use had the effect of depriving Swatch Group of the

ability to know and control precisely who heard the call. But whatever

cognizable interest Swatch Group has in maintaining that ability, it merits little

weight here. As we recently observed in a related context, "a [f]irm's ability to

make news—by issuing a [report] that is likely to affect the market price of a

security—does not give rise to a right for it to control who breaks that news and

how." *Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 907 (2d Cir.

2011).

We accordingly agree with the district court that the fourth statutory factor

weighs in favor of fair use.

E. Balance of Factors

Balancing the four statutory factors together, we conclude that "the

copyright law's goal of promoting the Progress of Science and useful Arts would

44

be better served by allowing [Bloomberg's] use than by preventing it." *Bill Graham Archives*, 448 F.3d at 608 (quoting *Castle Rock*, 150 F.3d at 141). Although Bloomberg copied the recording without changing it, Bloomberg's use served the important public purpose of disseminating important financial information, without harm to the copyright interests of the author. Furthermore, although the recording remains technically unpublished under § 101, Swatch Group controlled the first dissemination of its executives' expression to the public, and Swatch's copyright is thin at best. Indeed, the whole purpose of the conference call was to convey financial information about Swatch Group to analysts and investors around the world. And while Bloomberg used the recording in its entirety, doing so was reasonably necessary in light of Bloomberg's purpose. Finally, we are confident that this type of use will neither significantly impair the value of earnings calls to foreign companies that convene and record them, nor appreciably alter the incentives for the creation of original expression. In sum, under the particular circumstances of this case, Bloomberg's use is fair use.

## II.    *Bloomberg's Cross-Appeal*

Having resolved Swatch's main appeal on the ground of fair use without reaching the issue of copyrightability, we must address Swatch's motion to dismiss Bloomberg's cross-appeal. That motion is granted, for two reasons.

First, it is axiomatic that "[i]n order to have standing to appeal, a party must be aggrieved by the judicial action from which it appeals." *Great Am. Audio Corp.*, 938 F.2d at 19. Here, the May 18, 2012 judgment identified in Bloomberg's notice of appeal as the subject of the cross-appeal provides simply: "[f]or the reasons stated in the Court's Opinion and Order dated May 17, 2012, judgment is hereby entered in favor of [Bloomberg]." Special App. 13. The May 17, 2012 Opinion and Order, in turn, had explained that "since [Bloomberg]'s use qualifies as fair use, [Bloomberg] has not infringed, and [Swatch]'s Second Amended Complaint should be dismissed." *Swatch II*, 861 F. Supp. 2d at 343.

Bloomberg argues that it is aggrieved by the May 18, 2012 judgment because it seeks a decision not only as to whether its use was fair use, but also as to whether Swatch's recording was validly copyrightable in the first place. To the extent Bloomberg contends that Swatch's complaint should be dismissed on the

ground of copyright invalidity in addition to or instead of the ground of fair use, Bloomberg "is not urging that we alter the judgment in any way, but rather that we alter the reasons underlying it." *Allstate Ins. Co. v. A.A. McNamara & Sons, Inc.*, 1 F.3d 133, 137 (2d Cir. 1993). While Bloomberg "is entitled to urge that we affirm the district court's decision on any basis submitted to that court and supported by the record," *id.* (quoting *Great Am. Audio Corp.*, 938 F.2d at 19), it is not aggrieved by the district court's dismissal of Swatch's complaint on the ground of fair use, and therefore "is not entitled to cross-appeal," *id.*

Second, to the extent that Bloomberg challenges the district court's dismissal of its counterclaim seeking a declaration that Swatch's copyright is invalid, that ruling of the district court is not properly before us. Federal Rule of Appellate Procedure 3(c)(1)(B) provides that a notice of appeal "must . . . designate the judgment, order, or part thereof being appealed." This requirement is "jurisdictional in nature." *Gonzales v. Thaler*, 132 S. Ct. 641, 652 (2012) (quoting *Smith v. Barry*, 502 U.S. 244, 248 (1992)). Bloomberg's notice of cross-appeal, filed on June 28, 2012, designates only the district court's May 18, 2012 judgment, which did not resolve Bloomberg's counterclaim. As the May 17, 2012 Opinion

and Order incorporated into the judgment makes plain, the district court simply dismissed Swatch's complaint on the ground of fair use, "assum[ing], without deciding, . . . that [Swatch]'s copyright is valid." *Swatch II*, 861 F. Supp. 2d at 338. It was not until August 27, 2012, that the district court issued an order dismissing Bloomberg's counterclaims as moot. Bloomberg never filed any additional or supplemental notice of appeal designating that subsequent order as the subject of a cross-appeal. While "we construe notices of appeal liberally, taking the parties' intentions into account," *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 256 (2d Cir. 1995), we cannot reasonably read Bloomberg's notice of cross-appeal to contemplate review of an order that did not issue until nearly two months afterwards. While Bloomberg may be aggrieved by the dismissal of its declaratory counterclaim, which arguably would have enlarged Bloomberg's rights, we have no jurisdiction to review it in the absence of a proper cross-appeal. *See Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.*, 38 F.3d 1279, 1286 (2d Cir. 1994).

Bloomberg's cross-appeal accordingly is dismissed for lack of standing and lack of jurisdiction.

48

## CONCLUSION

For the foregoing reasons, Bloomberg's cross-appeal is **DISMISSED**, and the district court's judgment is **AFFIRMED**.